EXHIBIT "4"

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF
 2              ARKANSAS FAYETTEVILLE DIVISION
 3   JAMES LYNCH AND SHANNON     )
     LYNCH, individually and     )
 4   on behalf of, PARKER        )
     LYNCH AND HIS ESTATE,       )
 5                               )
              Plaintiffs,        ) CASE NO.:
 6                               ) 5:23-CV-5015-TLB
     VS.                         )
 7                               )
     LEECO STEEL, LLC, D & F     )
 8   EQUIPMENT SALES INC., AND
     ARKANSAS MACHINE WORKS,
 9   INC.
              Defendants
10
11
12           ORAL DEPOSITION OF ADAM GROVES
                  SEPTEMBER 22, 2023
13                  VOLUME 1 OF
14
15
16           ORAL DEPOSITION OF ADAM GROVES, produced as a
17   witness at the instance of the Defendant and duly sworn,
18   was taken in the above styled and numbered cause on
19   Friday, September 22, 2023, from 9:07 A.M. to 10:15 A.M.,
20   before MICHELLE MINOR, CSR in and for the State of Texas,
21   reported by computerized stenotype machine remotely via
22   Zoom from her home located in Houston, Texas, pursuant to
23   the Texas Rules of Civil Procedure and pursuant to the
24   Current Emergency Order Regarding the COVID-19 State of
25   Disaster.
```

                                                    Page 1

1                    A P P E A R A N C E S
2

FOR THE PLAINTIFF:
3       Mr. Ranchor Harris
        GIRARDI KEESE
4       1126 Wilshire Boulevard
        Los Angeles, California  90017
5       Ranchor@robertsandharrispc.com
6

FOR THE DEFENDANT:
7       Ms. Laura Kugler
        GORDON REES SCULLY  MANSUKHANI, LLP
8       400 W. Capitol Avenue, Suite 1700
        Little Rock, AR 72201
9       Lkugler@grsm.com
10

FOR THE DEFENDANT:
11      Ms.  Kimberly Young
        FRIDAY ELDREDGE & CLARK LLP
12      400 West Capitol Avenue, Suite 2000
        Little Rock, Arkansas  72201
13      Kyoung@fridayfirm.com
14
15
16
17
18
19
20
21
22
23
24
25

                                        Page  2

```
 1                    I N D E X
 2
                                              PAGE
 3
 4   APPEARANCES.................................    2
 5       ADAM GROVES
 6   EXAMINATION
         BY MS. KUGLER...........................    5
 7       BY MS. YOUNG............................   41
 8
     CORRECTION PAGE.............................   46
 9   SIGNATURE PAGE..............................   47
     REPORTER'S CERTIFICATION....................   50
10
11
                    E X H I B I T S
12
     NO.             DESCRIPTION              PAGE
13   Exhibit 1       Deposition Notice          46
     Exhibit 2       CV                         46
14   Exhibit 3       Report                     46
     Exhibit 4       Photos                     46
15
16
17
18
19
20
21
22
23
24
25
                                         Page  3
```

 1                    THE REPORTER:  All right.  Today's date is

 2    September 22nd, 2023, and the time is 9:06 a.m.

 3    We are on the record.

 4    Mr. Groves, will you please raise your right hand?

 5                         ADAM GROVE,

 6    having been first duly sworn, testified as follows:

 7                    THE WITNESS:  Adam Grove, no S.

 8                    THE REPORTER:  Thanks.

 9                    MS. KUGLER:  Sorry, that was a typo in what

10    I sent you.

11                    THE REPORTER:  All right.  Thank you.

12                    THE WITNESS:  You bet.

13                    THE REPORTER:  All right.  At this time,

14    will counsel please state their appearances for the record

15    and we can begin.

16                    MR. HARRIS:  Good morning.  Ranchor Harris,

17    I'm attending on behalf of the plaintiffs in this action.

18                    MS. YOUNG:  I'm Kimberly Young on behalf of

19    Arkansas Machine Works and D&F Equipment Sales, Inc.

20                    MS. KUGLER:  And Laura Kugler, on behalf of

21    LEECO Steel.

22                    THE REPORTER:  All right.  We can begin.

23                    MS. KUGLER:  Before we begin, Adam, I'm

24    going to make a few agreements with Mr. Harris, and then

25    we'll start.

                                                      Page  4

1               Counsel, can we agree that one objection is

2     good for all defendants present?

3               MR. HARRIS:  Absolutely.

4               MS. KUGLER:  Mr. Grove, my name is Laura

5     Kugler.  I --

6               MR. HARRIS:  Laura, and just to form?

7     Right, we're objecting to form?

8               MS. KUGLER:  Yes, yes, yes.  Form and

9     responsiveness.

10              MR. HARRIS:  Absolutely.  Thank you.

11              MS. KUGLER:  And since Dan isn't present, I

12    guess we don't need to make any agreements about the use

13    of this deposition.  We don't have any opposition to it

14    being used by other -- in other lawsuits connected to the

15    incident, but they aren't here to make that.  So we'll let

16    them worry about that later.

17              MR. HARRIS:  Yeah, that's fine.

18                        EXAMINATION

19    BY MS. KUGLER:

20       Q.  Mr. Grove, my name is Laura Kugler.  I introduced

21    myself briefly to you before we started.

22              Have you ever given a deposition before?

23       A.  I have not, Laura.

24       Q.  Okay.  Then let -- I'm sure that Ranchor

25    explained how this is going to go to you, but if at any

```
1   time you need to take a break, you let me know.  I really

2   do not anticipate this taking very long at all.  I just

3   have a couple questions for you.  If at any time you don't

4   understand my question, please let me know and I will

5   rephrase it.  Otherwise, I'll assume that you have

6   understood my question.

7              Also, our lovely court reporter takes down

8   everything that we say.  She cannot take down nods of your

9   head, motions with your hands.  As you can see, I'm a

10  hand-talker, so it's an issue with me.  So if you can

11  answer out loud and where yes or no is required, that's

12  much better than uh-huh and huh-uh because that's really

13  hard for us to read later, okay?

14      A.  Understood.  If you need me to clarify, please

15  just say so and I'm happy to do so.

16      Q.  I will.

17              All right.  Also, because we're on Zoom, as

18  we were discussing my technological challenges, if at some

19  time we freeze, or you can't hear me, or it gets fuzzy,

20  you know, waive your hands, we'll stop, we'll do

21  something.  And I'll do the same for you because it does

22  happen, as we all know.

23      A.  Okay.  And Laura, just so you know, I may be

24  checking my phone periodically.  We have a pretty good

25  storm coming in to Virginia Beach, and the daycare will be
```

Page 6

```
 1   reaching out to me if I need to go get my girls early.

 2       Q.   Absolutely.  Like I said, I'm really hoping this

 3   truthfully takes an hour or less.

 4       A.   Okay.

 5       Q.   But, yes, absolutely, if anything happens, you

 6   just tell us.  It's not a big deal, we can reconvene

 7   later, okay?

 8       A.   Thank you.

 9       Q.   All right.  Can you please state your full name

10   for the record?

11       A.   Adam Stuart Grove.

12       Q.   And Mr. Grove, where are you today?

13       A.   I'm in Virginia Beach, Virginia, today.

14       Q.   And what is your address in Virginia Beach?

15       A.   Well, I'm on a month long vacation with the

16   family.  So do you want the --

17       Q.   Why don't you just give us your location just for

18   purposes of the record.  The court reporter needs that.

19       A.   Okay.  I am at Virginia High Performance in

20   Virginia Beach, and I will pull up the address right now

21   for you.  It is 1024 Bells Road, B-E-L-L-S, Suite 117,

22   Virginia Beach, Virginia 23451.

23       Q.   And what is your current home address, which I

24   understand is different than your location?

25       A.   Yes.  It's 1213 Kalworth Road K-A-L-W-O-R-T-H.
```

Page 7

1    And it's Wake Forest, North Carolina 27587.

2        Q.  And what is your current occupation?

3        A.  I am -- I just launched a  fund, so I'm searching

4    for a manufacturing business to acquire.

5        Q.  Prior to that, how were you employed, or who was

6    your employer?

7        A.  I was the CEO of a few e-commerce companies, one

8    conglomerate e-commerce start-up in the Raleigh area.

9        Q.  And what was the name of that company?

10        A.  Daily Knight Incorporated was the holding

11    company.

12        Q.  And how long did you work there?

13        A.  Ten months.

14        Q.  And prior to that what did you do?

15        A.  I worked at a single family office.

16        Q.  Was that Grand Capital Company?

17        A.  That's correct.

18        Q.  And were you there from 2018 to 2022?

19        A.  Yes.

20        Q.  And what -- what were your job duties there?

21        A.  I was the director of strategic operations.  I

22    oversaw a few -- clarification, I oversaw a couple of

23    Legacy manufacturing firms of the founder.  While I was

24    there, I exited two of those firms.  I exited some of his

25    commercial real estate holdings, and then about 50 percent

Page 8

```
 1    of my time was spent interviewing asset managers for
 2    placing different investments for the family.
 3         Q.  And prior to that, did you work for another part
 4    of that company called Grand Capital --
 5         A.  I did.  Yes, yes, Laura.  Sorry, I don't mean to
 6    cut you off.  Yes.
 7         Q.  I should have told you that as well.  It's hard
 8    because our court reporter is taking down everything we
 9    say, so it's -- it's most helpful to her if we do not talk
10    over each other.  And it's an even greater challenge on
11    Zoom, and it's not you, Adam.  We all do it.  Don't feel
12    bad when it happens.
13         A.  Okay.
14         Q.  And it's also -- because my personality and I can
15    tell yours, this will become a conversation.  And
16    that's -- so sometimes you will anticipate what my
17    question is going to be.  Try to wait until I get the
18    whole question out, and I will try to do the same for you,
19    okay?
20         A.  I'll do my best.
21         Q.  It makes it a lot easier for our court reporter.
22              Okay.  Prior to becoming the director of
23    strategic operations for Grand Capital Company, did you
24    work for another part of that family business?
25         A.  I did.  The Grand Group is a group of family
```

Page 9

1    businesses, family-affiliated businesses.  And I worked

2    for Grand Partners, which is a private liquidation

3    company.

4        Q.  And how long did you work for Grand Partners?

5        A.  For three years.

6        Q.  And what did you do for them?

7        A.  I was an investment analyst.

8        Q.  I should have asked this earlier, what is your

9    date of birth?

10       A.  8/22/84.

11       Q.  Feeling so old yet again myself.

12           And where did you grow up?

13       A.  Loganville, Pennsylvania.

14       Q.  And what is your educational background?

15       A.  My highest level is an MBA from Norton School of

16   Finance at University of Pennsylvania.

17       Q.  And did you -- did you go to Norton 2017 to 2019?

18       A.  Yes, I did.

19       Q.  And where is your college degree from?

20       A.  Drexel University.

21       Q.  In Philadelphia?

22       A.  Yes.

23       Q.  And when did you go to Drexel?

24       A.  I -- I believe I graduated from Drexel in 2016.

25       Q.  And when did you start at Drexel?

Veritext Legal Solutions
800-336-4000

1      A.  I believe 2015, either 2015 or -- yeah, 2015.

2  2015, Laura.  Sorry, it was an 11 month -- I was able to

3  get my undergrad in 11 months.

4      Q.  How is that?  That's what I was curious about?

5      A.  Yeah, so I sat down with the president of

6  Drexel -- and they have a really good program for

7  undergrads, like, myself.  So they were able to apply

8  approximately half the credits necessary for a general

9  studies undergraduate degree.  And then at that point I

10  took a -- just a double-course load for 11 months while I

11  was working private equity.  Needless to say, the nights

12  were short.

13      Q.  Okay.  Well that's -- I thought it might be a

14  typo on your CV, and that's why I was inquiring.

15          Okay.  So it's my understanding you served

16  in the U.S. Navy; is that right?

17      A.  That's correct.

18      Q.  Did you join the Navy after high school?

19      A.  I did.

20      Q.  And when did you graduate high school?

21      A.  2002.

22      Q.  And you started your Navy service in 2002 or

23  2003?

24      A.  Ten days after graduation.

25      Q.  And how long did you serve in the U.S. Navy?

Page 11

1       A.   A little over 13 years.

2       Q.   And I assume you enlisted?

3       A.   Yes, ma'am.

4       Q.   And when you graduated -- sorry.

5            When you left the Navy, not graduated, when

6   you left the Navy what was your rank?

7       A.   I was an E-7 work chief in the Navy.

8       Q.   And when you enlisted, what was your rank?

9       A.   Either an E-1 or E-2.  I believe E-2.  I think

10  they -- because of Asvab Score or something there, I was

11  an E-2 instead of an E-1.

12      Q.   And during your time in the Navy, I understand

13  that you were a Navy SEAL; is that correct?

14      A.   Yes, Laura.

15      Q.   When did you become a -- in -- I don't know what

16  it's called -- when did you begin your Navy SEAL training?

17  You can correct me on the terminology.

18      A.   Yes.  No, I'll walk you through, it would be

19  easier.  So I joined in June of 2002.  Boot camp ended of

20  that summer, August timeframe, 2002.  I then went to IS

21  School.  Back then you had to have a specific rate.  I was

22  an intelligence specialist, and that, I believe, took

23  three months.  And then I was -- classed up with my BUD/S

24  class, or SEAL class, in early 2003.  And I recall -- I

25  think it was February, I don't recall the exact month.

Page 12

1    And so that would be -- I suppose that would be the start

2    of my SEAL training.

3         Q.   And you remained in -- in the Navy SEAL program

4    until 2015 when you left the Navy, correct?

5         A.   That's correct.

6         Q.   Okay.  And at some point -- well, strike that.

7                   What was your occupation, or what was

8    your -- what did your duties entail as a Navy SEAL, if you

9    can walk us through that?

10        A.   Sure.  So originally at SEAL Team 7, I was a -- I

11   lead communications for our platoon, so I was the radio

12   man.  That was for the first two years or so, if I recall.

13        Q.   Okay.

14        A.   I was also a JTAC, which is a joint terminal air

15   controller, controlling aircraft and fires from aircraft

16   to the ground, maneuvering forces around, understanding

17   where all the levels of aircraft are in a battle space.

18                   After one deployment to Iraq, I came back

19   and went to Sniper School and Freefall School.  And then I

20   was a sniper on the next deployment with the JTAC

21   certification, so I was able to lead a few missions at a

22   very young age.

23                   Then I came back from that second Iraq

24   deployment and screened for Development Group, which is

25   commonly referred to as SEAL Team 6.  After going through

Page 13

```
1    that training, I was in an assault team for -- an assault
2    team is a small group of guys that actually goes through
3    the door, through the breach and taking down the target
4    among other things but -- just to try and do my best to
5    put it in layman's terms for this.
6        Q.  Right.
7        A.  And I did that for, I believe, for two rotations
8    through Afghanistan and part of Africa.  And then I went
9    through Reci Team.  A Reci Team is where you focus solely
10   on sniper engagements and navigating the other teams to
11   the target area and away from the target area.
12   Planning -- planning the entire mission from a -- getting
13   on the helicopter to getting back to base perspective.
14   And then I did that for -- for probably six rotations, or
15   about five years, my final five years at SEAL Team 6.
16              I was also -- I'm sorry I left out, I was
17   also a -- in that assault time in those first couple
18   years, I was made the squadron breacher.  So I became
19   extremely familiar with different size and types of
20   explosives to defeat different objectives.  Whether that's
21   just gaining entry into a building, or whether that's
22   eliminating a building, or vehicle, or ship, hatch, or you
23   name it.
24       Q.  During your service as a Navy SEAL, did you
25   undergo any type of specific ballistics training?
```

Page 14

```
 1        A.  So sniper school, Navy SEAL Sniper School is a --
 2   I believe a three-month long -- well, I guess in all it's
 3   about a six-month long with a three month focus, on
 4   putting bullets through weapons and targets.
 5        Q.  Okay.
 6        A.  And then when I was at SEAL Team 6 in Reci
 7   capacity, we would do three, probably three Reci trips a
 8   year to different shooting facilities and different
 9   shooting courses using ballistic computers, using
10   chronographs, shooting many different sniper rifles and
11   scopes, and down select different scopes, and new weapons
12   platforms, and different types of bullets for specific --
13   specific weapons platforms.
14        Q.  And these schools, you -- you're referring to,
15   basically, sharp-shooter training, that type thing,
16   correct?
17        A.  Yes.
18        Q.  Okay.  The use of different firearms, different
19   ammunition for different result?
20        A.  Yes.
21        Q.  Okay.  And when you talk about recognize trips
22   can you spell that for us so we know what that means?
23        A.  Yes, of course.  Reci is an abbreviation for
24   recognizance.
25        Q.  Okay.  Got it.  Not W-R-E-C-K, but recognizance,
```

Page 15

1   R-E-C?  Got it.

2        A.  Yes, ma'am.  Some of the acronyms are tough to

3   draw out.

4        Q.  Especially for us who don't know the terminology.

5             Do you have any certifications in

6   association with your service in the Navy?

7        A.  Certifications.  I mean I --

8        Q.  Go ahead.

9        A.  I would have graduate certificates from the SEAL

10  sniper course.

11       Q.  Okay.

12       A.  And from various -- various advance shooter

13  courses.

14            I certainly have my Navy SEAL certificate

15  from finishing that.  And then this would be before the

16  many other qualifications I hold as, you know, from the

17  explosives, to driving to, you name it.

18       Q.  During your time as a Navy SEAL, I assume you

19  wore some type of body armor at times?

20       A.  That's correct.

21       Q.  Do you have any training in the use of body

22  armor?

23       A.  Yes.

24       Q.  And what would that be?

25       A.  Well, we -- I don't know how best to answer that.

Page 16

1    I mean, I wore a body armor for almost every -- 99 percent

2    of every mission I've ever been on.  And we would train

3    the way we fight.  So again, 99 percent of training would

4    have body armor, and a full -- full load out, as we call

5    it, so that we were always -- always training for the real

6    thing.

7        Q.  Are you trained at all in the physical properties

8    of ammunition?

9        A.  I have no academic training in the --

10       Q.  Okay.

11       A.  -- physical properties of ammunition.

12       Q.  And to that end, you're not an engineer, correct?

13       A.  I am not an engineer.

14       Q.  You're not a physicist, correct?

15       A.  I am not a physicist.

16       Q.  And you're not a metallurgist, correct?

17       A.  I am not a metallurgist.

18       Q.  Okay.  Let's talk a little bit about your report

19   in this case.

20              Did you, in fact, issue a report in this

21   case?

22       A.  Yes, I did.

23       Q.  I don't think it has a date on it, but I got it

24   around August the 18th.

25              Does that sound about right?

Page 17

1              THE WITNESS:  Ranchor, does that sound

2      right?  Can I ask him that?

3              MR. HARRIS:  Well, I think we provided it

4      whenever it was due.

5      Q.  (BY MS. KUGLER)  Yeah, so you wrote this report

6      sometime in August of this year?  Does that sound right?

7      A.  Yes, that sounds correct.

8      Q.  Okay.  I'm not trying to be a stickler, I just

9      don't see a date on it.

10     A.  Okay.

11     Q.  And what were you asked to do by Mr. Harrison's

12     case?

13     A.  Well, so this was the -- being the first time

14     that I developed a report like this, Mr. Harris asked me

15     if I would be willing to review the facts of the case and

16     provide a report, or my opinion, on whether or not the

17     body armor was being worn correctly.  And any other

18     opinions that -- that I had after reviewing the -- the

19     vault room or data room documents.

20     Q.  What exactly did you review in this case?  Can

21     you itemize that for me?

22     A.  I -- I don't -- I think I would have to go into

23     the data room to show you exactly what -- I definitely

24     reviewed the police reports.

25     Q.  (Indicating.)

Page 18

1      A.  And all of the police reports.  I reviewed Dr.

2   Rasby's report.  And I believe all the pictures were a

3   part of the -- the pictures and video were a part of the

4   police reports, but if not, then, those as well.

5      Q.  And you say the police report, is that the Graham

6   County Sheriff's Report, and was it -- I think it's about

7   46 pages long.

8          Does that sound correct?

9      A.  Did that report have maybe five or six different

10  officer's accounts in it?

11     Q.  It did, yes.

12     A.  Then that sounds like the one, yes.

13     Q.  Okay.

14          MS. KUGLER:  Ranchor, for purposes just of

15  my questioning, does that sound correct to you, that he

16  was given the Graham County Sheriff's Report?

17          MR. HARRIS:  It does, Laura.

18          MS. KUGLER:  Okay.  Thank you.

19     Q.  (BY MS. KUGLER)  Did you seek out any additional

20  materials, other than what Mr. Harris sent you for review

21  in this case?

22     A.  Not more than reviewing different classifications

23  of body armor online.  Just -- just brief jog of the

24  memory type of searches.

25     Q.  And when you say classifications of body armor

Page 19

```
 1   online, did you go to any specific website, like NIJ, or
 2   what sources did you seek out?
 3        A.  NIJ was certainly one of them.
 4        Q.  Can you recall where else you might have looked?
 5        A.  I cannot, Laura.  It's something that I will be
 6   more diligent about if I ever do something like this
 7   again.
 8        Q.  Okay.  The pictures you referred to, were those
 9   pictures of the incident site?  What do you recall about
10   those pictures?
11        A.  It was pictures of the incident site.  It was --
12   there were pictures of the -- the carrier.  There were
13   pictures of the -- the props that were alluded to be
14   resting the body armor on for testing.  I believe there's
15   pictures of the vehicle.  There were all nighttime, and
16   then the video, of course, as well.
17        Q.  And as -- and you believe these were all pictures
18   associated with the police report that we've just alluded
19   to, correct?
20        A.  That is -- that's my understanding, yes.
21        Q.  Okay.  Included in those pictures, was there also
22   a picture of the firearm itself?
23        A.  Yes, there was.
24        Q.  And other than the picture of the firearm, in
25   association with the police report, have you examined the
```

Page 20

1     firearm that was part of the incident physically, have you

2     ever seen it?

3          A.  I have not.

4          Q.  Okay.  Did you see any pictures of the ammunition

5     used, or allegedly used, in this incident?

6          A.  Yes.

7          Q.  And where would those pictures came from, do you

8     know?

9          A.  The same place.

10         Q.  Okay.

11         A.  I say alleged, but maybe -- the pictures -- they

12    had a picture of a box of ammunition.  I don't -- I

13    don't -- I guess I may have inferred that that was

14    allegedly the -- ammo.

15         Q.  And is that one picture of the box of ammunition

16    the only picture you saw of the ammunition supposedly used

17    by Mr. Watson?

18         A.  I believe there may have been one with a -- an

19    officer or somebody with their hand out with a couple

20    rounds in it, but I would have to review the pictures --

21         Q.  Okay.

22         A.  Again.

23         Q.  Other than the police report, Dr. Rasby's report,

24    and the pictures and video in association with the police

25    report, did you review -- did you receive any other

                                                   Page 21

1    materials from Mr. Harris for review in this case?

2        A.  No, I did not.

3        Q.  Okay.  And other than conducting some online

4    research about classifications of body armor, did you do

5    any other independent work in this case in issuing your

6    opinions?

7        A.  Not that I understand the question.

8        Q.  Okay.  I take it you never personally examined

9    any of the ammunition used in connection with this

10   incident, correct?

11       A.  I have not.

12       Q.  Okay.  You did watch the videotape of the

13   incident which was recorded by one of the boys involved,

14   correct?

15       A.  I have, yes.

16       Q.  Is there anything else you would have liked to

17   have seen or have asked the plaintiff's counsel for in

18   connection with your opinions in this case?

19       A.  Not that I can think of.

20       Q.  Okay.  Do you have a file, so to speak, in lawyer

21   terms, for your review in this case?

22       A.  I do.

23       Q.  Other than the documents we have just discussed,

24   is there anything else contained in that file?

25       A.  I have -- I have just case hours that I've

Page 22

```
 1   listed --

 2        Q.  (Indicating.)

 3        A.  -- for invoicing purposes and just a few call

 4   logs.

 5        Q.  And I assume those call logs are just notes

 6   between -- you and Mr. Harris's conversations?

 7        A.  Yes.

 8        Q.  How many times have you talked to Mr. Harris

 9   about this case?

10        A.  I -- I would say three times with two call logs.

11        Q.  Let me just go ahead and ask about the invoicing

12   now since you got that there.

13             How many hours have you spent in this case?

14        A.  Including this hour?

15        Q.  Not including this.

16        A.  Not including this, I'm up to eight hours.

17        Q.  And I assume you charge for your time?

18        A.  Yes.

19        Q.  What is your billing rate?

20        A.  $300.

21        Q.  An hour?

22        A.  For one -- yes.

23             And then $400 for deposition.

24        Q.  Okay.  What did you do to prepare for today's

25   deposition?
```

Page 23

```
 1        A.  I reviewed the report that I issued, and I

 2   reviewed Dr. Rasby's report.  I got some good sleep and a

 3   workout.

 4        Q.  Do you have anything in front of you today?

 5        A.  No, just a notepad that I'm taking some notes

 6   on -- how this goes.

 7        Q.  And do you have your computer with you that

 8   you're able to refer to documents?

 9        A.  Yes.

10        Q.  Okay.  And it's my understanding you have a copy

11   of your report; is that correct?

12        A.  I do.  It's on my laptop.

13        Q.  Okay.  If -- if you want to pull that up to

14   assist you, that would be great.  I'm going to ask you a

15   couple questions about your report.

16        A.  Okay.  It's up.

17        Q.  Okay.

18            MS. KUGLER:  And I'm going to -- if you all

19   can give me one second.  We don't have to go off the

20   record, but let me just -- my daughter is texting saying

21   she doesn't have her psychiatrists Zoom link for her

22   appointment today, and I personally don't want to spend

23   the $250 if she can't get on the link.  So hold one second

24   while I send this to her.

25            MR. HARRIS:  No problem.
```

Page 24

1           MS. KUGLER:  Sorry.  Okay.  I'm sorry.  I

2    apologize.  She's 22.  One would think she could figure

3    this out herself but --

4           THE WITNESS:  My oldest is 2, so I have a

5    long time.

6           MS. KUGLER:  Just wait, it doesn't get that

7    much easier.  It's ever-evolving.

8       Q.  (BY MS. KUGLER)  All right.  I want to talk to

9    you a little bit about your report in this case.

10          You note at the bottom of Page 1, the plate

11   which failed to stop the projectile was reportedly

12   manufactured by LEECO.

13          Where did you obtain that information?

14      A.  Well, that would have been from Dr. Rasby's

15   report.

16      Q.  You don't have any independent knowledge as to

17   whether or not that plate was manufactured by LEECO, do

18   you?

19      A.  I have no independent knowledge, no.

20      Q.  Okay.  Do you have any opinion, other than what

21   you obtained from Dr. Rasby's report, as to who was the

22   manufacturer of the steel used in the vest or body armor?

23      A.  I do not.

24      Q.  And for purposes of our discussion, if I use the

25   term vest, I'm talking about the body armor, which is at

                                                  Page 25

1    issue in this case.

2              Can we have that understanding?

3        A.  Well, when you say vest, you mean body armor?

4        Q.  Yes.

5        A.  Okay.  Yes, that's fine.

6        Q.  Being not quite as sophisticated as you are

7    sometimes, I lean back to the bulletproof vest because

8    that's what we all know them rather than body armor.

9              What is the intended purpose of body armor?

10       A.  To stop projectiles in any form from entering the

11   vital area of your body.

12       Q.  You indicate in your report that Mr. Lynch was

13   not misusing body armor.

14             What would constitute a misuse of body

15   armor?

16       A.  As I understand it, a misuse would be wearing it

17   in a manner that is not intended to be worn.

18       Q.  And when you say that, do you mean a physical

19   wearing?  Meaning you put it on -- I'm trying to make a

20   ridiculous assumption.  You put it on backwards, or you

21   wear it on your middle instead of on your chest.

22             Are you talking about that?

23       A.  Yes.

24       Q.  Okay.

25       A.  It could be wearing too low; it could be wearing

Page 26

1    too high; it could be reversing the plates.  Basically,

2    what you -- what you stated, yes.

3        Q.  Okay.  And it's your opinion that Mr. Lynch had

4    on the body armor appropriately -- he was wearing it

5    appropriately on his physical person?

6        A.  That's correct.

7        Q.  Okay.  Would the intentional shooting of body

8    armor to test its ability to perform be an appropriate use

9    of the body armor for a consumer?

10       A.  With the -- so I can't -- it's difficult for me

11   to comment from a consumer's perspective.  I can comment

12   that I have personally tested body armor by shooting it

13   many times.

14       Q.  And when you say that, would that be on a live

15   person or on an inanimate object?

16       A.  It's never on a live person.

17       Q.  Okay.

18       A.  Or it was never on a live person for training

19   purposes.

20       Q.  Would dawning a bullet proof vest or body armor

21   and having an untrained friend shoot you at close range be

22   an appropriate use of body armor?

23            MR. HARRIS:  Objection to the form.  You can

24   answer.

25       A.  Can you repeat the question, please?

Page 27

```
 1        Q.   (BY MS. KUGLER)  Would dawning a body armor in an

 2   appropriate fashion, physically, and having an untrained

 3   friend shoot you at close use be an appropriate use of

 4   body armor?

 5             MR. HARRIS:   Same objection.

 6        A.   I'm trying to think from just the perspective of

 7   what the body armor's intended use is.  And I would say in

 8   that -- in that capacity it would not be misuse.  If it's

 9   being used to stop a bullet from entering your body, or

10   your vital area, your body cavity, then I would say that

11   it's not misused.

12        Q.   (BY MS. KUGLER)  Is it an appropriate use in your

13   opinion?

14        A.   I would not say it's an appropriate use, no.

15        Q.   Okay.  Would you consider that to be a

16   recommended use?

17             MR. HARRIS:   Objection to form.

18        A.   I wouldn't recommend anyone to do that, no.

19        Q.   (BY MS. KUGLER)  You note in your report that

20   this body armor was a swimmers cup, what does that mean?

21        A.   Swimmers cut body armor is cut in a way for

22   greater mobility of your shoulders and arms.

23        Q.   What's the difference between swimmers cut and

24   shooters cut?

25        A.   I would have to review that -- that definition.
```

Page 28

1    I'm not familiar with it.

2         Q.  Why do you believe that this plate was a swimmers

3    cut?

4         A.  I'd have to review where I got that information,

5    either from data in the data room or from the police

6    report.  But I -- I can't tell you with certainty right

7    now.

8         Q.  Did you review a picture of the vest in this

9    case?

10        A.  I did.

11        Q.  And -- okay.

12             Let me -- do you have a picture of the vest

13   that you looked at?

14        A.  I believe I do.

15        Q.  And I'll tell you, this is what I'm looking at.

16             Can you see that?

17        A.  Yes.  Yes, ma'am.

18        Q.  Okay.  I'll show it to you this way then.

19        A.  Okay.

20        Q.  It's probably easier since it's pretty big print.

21             Mr. Grove, you've seen this before, correct?

22        A.  I have.

23        Q.  And this is a picture of the sticker or label

24   that was on the inside of the vest, which was the subject

25   of this lawsuit, is that correct, to the best of our

Page 29

1    understanding?

2        A.  Yes, it looks the same.

3        Q.  Okay.  And I'll tell you that it says:  Black

4    Diamond Body Armor; and then it says:  Tontitown,

5    Arkansas; and then it says, size 10 x 12 shooters cut; is

6    that right?

7        A.  Yes, it does.

8        Q.  So my question is was this plate to the best of

9    your knowledge a swimmers cut or a shooters cut?

10        A.  By experience and looking at the body armor, it

11    was cut the way I know a swimmers cut plate to be cut.

12        Q.  Okay.  So your interpretation that it's a

13    swimmers cut is based on your physical observation of

14    pictures of the -- strike that.

15            What do you base your opinion that this was

16    a swimmers cut plate, rather than a shooters cut plate, as

17    noted on the labelling?

18        A.  Based on my experience with body armor.

19        Q.  And how did you draw that opinion?

20        A.  The -- the shape of the cut of the body armor.

21    Not -- not the vest, the shape of the plate.

22        Q.  Okay.  And how did you draw that opinion?  Was it

23    from looking at pictures or a physical examination of the

24    plates themselves?

25        A.  Through looking at pictures.

Page 30

1   Q. You state in your report that Parker was shot

2 with a .223 caliber bullet from a Rossi Rezz Tech Single

3 Wizard rifle.

4      What do you base that statement on?

5   A. The police report and Dr. Rasby's report.

6   Q. Do you know who the manufacturer was of the 2223

7 caliber ammunition?

8   A. I know that they mentioned Federal at some point,

9 but I know there was -- I believe there was other ammo

10 that they talked about that I would have no -- no idea

11 where that came from.

12   Q. And any knowledge you have about where the

13 ammunition came from would have come from the police

14 report, correct?

15   A. That's correct.

16   Q. You later note there was a .55 grain bullet.

17      What do you base that on?

18   A. Well, Laura, I can't be certain if I -- if that

19 was from the police report, Dr. Rasby's report, or if that

20 is the only grain bullet that Federal sells in .223, or if

21 it's all of those three.

22   Q. You're relying on somebody else for that

23 information, correct?

24   A. I believe I'm relying on the police report, but

25 again, I would have to review.

Page 31

1      Q.   Earlier we alluded to the National Institute of

2    Justice.

3              What is the National Institute of Justice?

4      A.   I know that they provide classifications for body

5    armor.

6      Q.   And would you agree that the NIJ was established

7    and updates voluntary minimum performance standards for

8    body armor?

9      A.   As far as I understand.

10     Q.   And they conduct testing against these standards

11   to ensure that body armor complies with the standards they

12   uphold?

13     A.   As far as I understand.

14     Q.   And they sponsor research to improve body armor?

15     A.   So far as I understand.

16     Q.   The picture of the vest that I showed you

17   earlier, it says Model Level IV; is that right?

18     A.   Yes, it does.

19     Q.   What does that mean, if you know?

20     A.   Level IV body armor?

21     Q.   Yes.

22     A.   It means it should be -- it should stop

23   everything that they basically lay out at the bottom of

24   that bottom body armor panel.

25     Q.   Do you have any training in the various levels of

Page 32

1    body armor?

2        A.   Yes.   When I started my career we went through

3    various levels of body armor.   I wore various levels of

4    body armor.   And we developed -- we didn't -- we -- as we

5    went along, we acquired the new and best body armor that

6    would come to market.

7        Q.   You have never been involved in any of the

8    setting of any standards for body armor, have you?

9        A.   No, I have not.

10       Q.   You've never performed certification of body

11   armor for the NIJ, have you?

12       A.   No, I have not.

13       Q.   Do you have any knowledge if this model of body

14   armor, which is the subject of this lawsuit, was ever

15   tested by the NIJ?

16       A.   I do not know.

17       Q.   Do you have any knowledge that this vest was ever

18   certified by the NIJ's Level IV?

19       A.   I do not know that either.

20       Q.   Okay.   Did you review the testimony of

21   Mr. Thame's in this case?

22       A.   I don't believe I did.

23       Q.   Okay.   Do you know who he is?

24       A.   It's not ringing a bell, no.

25       Q.   Okay.   As a Navy SEAL, did you ever -- were you

Page 33

1    ever involved in developing a protocol for the testing of

2    body armor?

3         A.   I would say, yes.   I would say, yes.

4         Q.   And in what way?

5         A.   With current body armor that we were using at the

6    time and with the prototype body armor -- newer

7    lightweight, always lighter, faster, we would -- we would

8    develop -- we would shoot them with different caliber

9    rounds into different quantities in different proximity to

10   original impact to see if they would withstand what the

11   classification was for that body armor, or what they --

12   basically, what the fail point is.

13        Q.   And were you physically performing those "tests,"

14   for lack of a better term, at the direction of another

15   individual, or were you personally involved in developing

16   the -- what I'll refer to as a protocol for the test?

17        A.   I would say that these -- these weren't hard and

18   fast protocols.   This was more of testing and evaluation

19   for our recognizance group.

20        Q.   So we used the term "work in the field?"

21        A.   We can use work in the field.

22        Q.   Okay.   Not in a laboratory?

23        A.   Not in a laboratory; that is correct.

24        Q.   Okay.   Would you agree that there's a difference

25   in firing a body armor on an individual, as opposed to

1    armor mounted on an inordinate object?  There would be a

2    different impact?

3         A.  Would I agree that it would be a different --

4    I -- you'd have to be -- you'd have to describe that a

5    little bit better, Laura.

6         Q.  And I'm sorry for my lack of scientific knowledge

7    about this, but it's my understanding that there would be

8    a different result, perhaps, between body armor that is on

9    an individual, as opposed to body armor that is laying on

10   the ground or pushed up against an object.

11             Physically, from the -- from the -- what's

12   the right word, aerodynamic perspective, that there would

13   be a different impact?

14             MR. HARRIS:  Object to the form.

15        A.  If what I -- I think what I'm hearing is:  would

16   the body armor perform differently if --

17        Q.  Correct.

18        A.  -- it was worn on a body, or if it was propped up

19   against something?

20        Q.  Correct?

21        A.  I would say if it was propped up against

22   something, it should perform -- if it was actually propped

23   against something, it should perform identical.

24             Basically, if there's surface area touching

25   every area piece, then, yes, it should perform the same.

Page 35

1    Q.  You note in your report that:  It is important to

2    note that the 30APM2, as stated in the back of the plate

3    refers to a .30 caliber round.

4         Why is it important to note that?

5    A.  Well, I thought it was important to note that --

6    if they are stating -- for the layperson, if they're

7    stating that it's a Level IV on the plate and that it can

8    withstand 30AP ammunition, that for someone to understand

9    that that bullet is a large, high kinetic energy round,

10   and that the round that was being used was a -- was much

11   smaller, much lower kinetic energy round.

12   Q.  Do you have any information about the projectile

13   construction in this case?  Meaning, it's -- well, go

14   ahead and answer that.

15   A.  The police report stated the -- they stated that

16   they purchased the .223 foil jacket but, again, I can't be

17   certain what bullet -- which projectile was actually used.

18   Q.  Do you know what the .223 full metal jacket was

19   made out of, it's metal properties?

20   A.  The full metal jacket?  I -- I don't want to -- I

21   don't want to say with certainty.  There's many different

22   colors of .223 rounds.

23   Q.  Do you have any information as to the design of

24   the .223 full metal jacket?

25   A.  I know what it -- what it looks like cut in half.

Page 36

1      Q.  But again, you don't know what it's made of?  You

2   don't have any information about the cartridge?

3      A.  No.

4      Q.  Do you agree that a projectile velocity is a

5   factor to consider in this case?

6      A.  Yes.

7      Q.  Again, looking at the label, the -- that was on

8   the back of the plate.  It says:  Special threat tested,

9   and then it has a bunch of numbers.

10            What indicates to you that this plate should

11   have defeated the projectile in this case?

12      A.  Well, the Level IV designation, and defeating, up

13   to and including, .30 caliber armor piercing.

14      Q.  And what on this label indicates to you that the

15   "up to and including language" refers to the 30APM2?

16      A.  Just -- I don't -- 39 years of my lifetime of

17   just reading and saying if it's in that order leading from

18   smaller to larger, that it would be up to and included.

19      Q.  Are you familiar with a gentleman by the name

20   of Buford Boone?

21      A.  Could you say the last name again?

22      Q.  Boone, B-O-O-N-E.

23            Have you ever met him?

24      A.  I don't believe so, no.

25      Q.  Okay.  You hadn't seen Mr. Boone's report in this

Page 37

1    case, have you?

2        A.  I don't believe I have.

3        Q.  Okay.  Did you ever do any training at the FBI

4    ballistic research facility in Quantico?

5        A.  I have done training at the FBI facility, but not

6    at the ballistic training.  I'm assuming -- I'm assuming

7    the ballistic training is a laboratory and not their

8    addressing team sniper range?

9        Q.  In your report, you say -- let me sure I get this

10   right:  It is important to note that the 30AM -- APM2 and

11   then there's a parenthesis and refers to a .30 caliber

12   round has a projectile weight of more than 160 grains.

13   While the .223 caliber bullet filed at Parker was

14   reportedly a .55 grain bullet.

15            What's the basis for that opinion?  And

16   well -- let me, and then you opine that the same metal

17   plate should more readily absorb the penetration of a

18   .223 bullet round.  What is the basis for that opinion?

19       A.  That is based on my experience there:  A

20   similarly shaped projectile with a greater kinetic energy

21   penetration than its smaller counterpart.

22       Q.  And that's just based on your personal

23   experience, correct?

24       A.  Yes, ma'am.

25       Q.  Did you see the Notice of Deposition in this

Page 38

1    case?

2        A.  I did, yes.

3        Q.  And this is just really -- I'll ask Mr. Harris to

4    provide these things later, just to clarify.  I want to

5    see if you have any of these things.  We asked for a

6    couple documents.  I have your resume, and I have your

7    report in this case.  And I should ask, the report that

8    we've been referring to, the two-page report that you

9    signed, that's the only report that you created in this

10   case, correct?

11       A.  That is the only report, yes.

12       Q.  Okay.  Did you rely on any literature or other

13   documents other than searching on the internet that we

14   talked about, looking at body armor standards to prepare

15   your report?

16       A.  Nothing more than what we've spoken about.

17       Q.  Okay.  And other than Dr. Rasby's report, you

18   haven't looked at any of the other expert reports in this

19   case, correct?

20       A.   Not that I can recall, no.  I would have to look

21   and see what's in the data room to answer with certainty.

22       Q.  And referring to the data room, what are you

23   talking about?

24       A.  The vault of data that was -- different documents

25   that were supplied to me.

Veritext Legal Solutions
800-336-4000

1          Q.  And those would be the documents that we've

2     referred to:  The police report, the pictures, the video

3     and Dr. Rasby's report, correct?

4          A.  Yes, ma'am.

5          Q.  Okay.  You didn't conduct any independent testing

6     or try to recreate the incident, correct?

7          A.  I did no such thing.

8          Q.  Okay.  Did you take any notes, or make any

9     summaries, other than what's reflected in your report, in

10    connection with your review in this case -- and taking out

11    of the call logs that we talked about as well?

12         A.  I -- I'm sure I took some notes, jotted notes

13    down throughout the 40-page police report to help form my

14    report.

15         Q.  Do you still have those notes?

16         A.  I'll have to check.  I should have them back in

17    North Carolina.

18         Q.  Okay.

19         A.  But I -- I will have to check.

20         Q.  Okay.  And you didn't receive any of the

21    deposition transcripts of any of the depositions taken in

22    this case, correct?

23         A.  No, I have not.

24         Q.  Have you ever authored any articles or reports on

25    body armor?

                                              Page 40

1        A.  I have not.

2        Q.  Have you ever published any articles, reports,

3    out into the public domain, not talking about in the Navy,

4    related to ballistics -- ballistics training?

5        A.  I haven't.

6        Q.  Have you ever authored any article or report

7    published into literature for any reason?

8        A.  I have not.

9        Q.  And you said this is your first time as an

10   expert; is that right?

11       A.  First time in this capacity, that's correct.

12       Q.  Okay.  And have you ever been hired in the past

13   as a consulting expert, meaning somebody who looks at

14   something, but doesn't testify?

15       A.  I have not.

16            MS. KUGLER:  I believe that's all the

17   questions I have for you.  I thank you for your time and I

18   also thank you for your service.

19            THE WITNESS:  Absolutely.  Thanks, Laura.

20                   EXAMINATION

21   BY MS. YOUNG:

22       Q.  Hi, Mr. Grove.

23            Can you hear me okay?

24       A.  Yes.

25       Q.  My name is Kim Young.  And I can tell you I'll

Page 41

1    have a lot fewer questions because Ms. Kugler has done a

2    lot of the heavy lifting today, but I did have some

3    follow-up questions for you.

4                Who did you say contacted you to work on

5    this case?

6        A.  Mr. Harris.

7        Q.  And have you ever worked with Mr. Harris before?

8        A.  No.

9        Q.  Do you have any idea how he came to have your

10   name as someone that might be helpful in this lawsuit?

11       A.  Yes, I worked with his brother at SEAL Team 6.

12   His brother was killed in action overseas, and I've known

13   Ranchor since.

14       Q.  Sorry to hear that.

15               I have some followup questions on your

16   experience with body armor and testing body armor.  Do you

17   know the manufacturer of any of the body armor vests that

18   you've worn in your military career?

19       A.  Not off the top of my head.

20       Q.  But you -- to your knowledge, you never worn body

21   armor manufactured by Black Diamond Body Armor, the

22   company at issue in this case; is that true?

23       A.  I mean to the -- to the best of my recollection,

24   that would be true.  I would -- I would have to look into

25   what exactly we had at that time.  Again, I changed out

Page 42

1    plates often, so it's difficult for me to say, Kimberly.

2        Q.   Okay.

3        A.   I'm sorry, do you prefer Kim?

4        Q.   Kim is fine, thanks.  Maybe the better way to put

5    it is this:  since you don't know the manufacturer of any

6    of the body armor that you wore in your military career,

7    you won't be testifying at trial that you've worn Black

8    Diamond Body Armor in the past; is that fair?

9        A.   With the knowledge I have today, that's fair to

10   say.  If I learn, between now and then, something

11   different, then that's the only way that would change.

12       Q.   You testified about testing that you participated

13   in, of body armor, and I understood your testimony to be

14   that you never tested body armor by firing it at a live

15   person while they were wearing it; is that correct?

16       A.   Never -- I've never fired at somebody wearing

17   body armor in a training scenario, no.

18       Q.   Can you tell me how the vest that you were

19   testing was positioned when it was fired upon?

20       A.   I can summarize a few of the scenarios:

21   Sometimes within a carrier vest, sometimes standing alone

22   up against sandbags, up against dirt mounds, and suspended

23   on a -- suspended on a target, a cardboard target cut out

24   similarly.  As far as I recall, those were all the

25   scenarios.

1     Q.  Thank you.

2         You said something when you were describing

3  the testing of a body armor vest and whether or not the

4  results of that test would be identical to if it were worn

5  by a person.  You said something about, it would be if the

6  surface area is touching every piece, and I just didn't

7  follow what you meant by that.

8         Can you explain that for me, please?

9     A.  Yeah, this would be -- well, of course from my --

10  my understanding of it, if something was -- like a plate

11  is just hanging from a chain, the plate is going to react

12  differently then if the plate is propped up against the

13  sandbag, or if something -- something solid behind it.

14     Q.  And as long as it is propped up with something

15  solid behind, it's your understanding the result that you

16  get from that would be the same as the result as if it

17  were to be tested by someone wearing it?

18     A.  That's -- as we tested them, that is what we

19  relied upon, yes.

20     Q.  You were asked a few questions about the

21  difference between a swimmers cut and a shooters cut.  And

22  my understanding of what you said is that comes down to a

23  difference in how the area around the arms and shoulders

24  is cut; is that correct?

25     A.  Yes.

Page 44

1       Q.  I think you said that a swimmers cut would

2    provide more mobility for the arms and the shoulders; is

3    that right?

4       A.  That's correct.

5       Q.  Okay.  And you've seen the photographs of the

6    plate that was perforated in this incident, true?

7       A.  I have.

8       Q.  And the hole, the bullet hole it perforated, the

9    plate is not in this shoulder or arms area; is that right?

10      A.  It is not.

11              MS. YOUNG:  All right.  Mr. Grove, I said

12   I'd be brief, and I think I delivered on that.  Those are

13   all the questions that I have.  Thank you.

14              THE WITNESS:  Absolutely, Kim.

15              MS. KUGLER:  Ranchor, do you have anything?

16              MR. HARRIS:  No, I have no questions.

17              MS. KUGLER:  Okay.  For purposes of the

18   record -- I was not good about this because we were

19   chatting, I wanted to go ahead and mark as Exhibit 1 the

20   Notice of Deposition.

21              MR. HARRIS:  Sure.

22              MS. KUGLER:  As Exhibit 2, Mr. Grove's CV

23   that we went over.

24              Exhibit 3, his report.

25              And just for clarification, I'll attach as

Page 45

1      Exhibit 4 the picture of the plate that we referred to.

2      And I will e-mail all of those -- those four exhibits to

3      all of you and the court reporter.

4                      (Exhibit No. 1-4 marked for identification.)

5                      MR. HARRIS:  That's fine.  And you -- can we

6      go off the record?  Are we done?

7                      MS. KUGLER:  Sure.  Yeah, that's all I had.

8                      MR. HARRIS:  That's all I had.

9                      THE REPORTER:  Time is 10:15 a.m.

10                      We're off the record.

11                  (Proceedings concluded at 10:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25                              CORRECTION PAGE

                                            Page 46

```
1   WITNESS NAME:  ADAM GROVE          DATE:  09/22/2023

2   PAGE  LINE  CHANGE               REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25                    SIGNATURE PAGE

                                        Page 47
```

1        I, ADAM GROVE, have read the foregoing deposition and
2    hereby affix my signature that same is true and correct,
    except as noted on the correction page.
3
4
                    _____
5                        ADAM GROVE
6
7
8    THE STATE OF TEXAS      )
    COUNTY OF _____ )
9
10       Before me _____ on this day personally
    appeared _____ known to me [or proved to
11   me on the oath of _____ or through
    _____ (description of identity card or
12   other document)] to be the person whose name is subscribed
    to the foregoing instrument and acknowledged to me that
13   he/she executed the same for the purposes and
    consideration therein expressed.
14       Given under my hand and SEAL of office this _____
    day of _____, 2022.
15
16
                    _____
17                       NOTARY PUBLIC IN AND FOR
                    THE STATE OF T E X A S
18
19   My Commission Expires:
    _____
20
21
22
23
24
25       Job No. TX6116227

                                                  Page 48

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF
 2               ARKANSAS FAYETTEVILLE DIVISION
 3   JAMES LYNCH AND SHANNON     )
     LYNCH, individually and     )
 4   on behalf of, PARKER        )
     LYNCH AND HIS ESTATE,       )
 5                               )
               Plaintiffs,       ) CASE NO.:
 6                               ) 5:23-CV-5015-TLB
     VS.                         )
 7                               )
     LEECO STEEL, LLC, D & F     )
 8   EQUIPMENT SALES INC., AND
     ARKANSAS MACHINE WORKS,
 9   INC.
               Defendants
10
11
12              REPORTER'S CERTIFICATION
               DEPOSITION OF ADAM GROVE
13                  TAKEN 09/22/2023
14
               I, MICHELLE MINOR, Certified Shorthand
15   Reporter in and for the State of Texas, hereby certify to
     the following:
16        That the witness,ADAM GROVES, was duly sworn by the
     officer and that the transcript of the oral deposition is
17   a true record of the testimony given by the witness;
          I further certify that pursuant to FRCP Rule 30(f)(1)
18   that the signature of the deponent was requested by the
     deponent or a party before the completion of the
19   deposition and is to be returned within 30 days from date
     of receipt of the transcript.  If returned, the attached
20   Changes and Signature Page contains any changes and the
     reasons therefor;
21
          I further certify that I am neither attorney or
22   counsel for, nor related to or employed by any of the
     parties or attorneys to the action in which this
23   deposition was taken.  Further, I am not a relative or
     employee of any attorney of record in this case, nor am I
24   financially interested in the outcome of the action.
               Subscribed and sworn to no this 10th day of
25   October, 2023.
```

Page 49

1

2

MICHELLE MINOR, CSR, CSR NO. 9244;

3    Expiration Date: 12-31-25

VERITEXT LEGAL SOLUTIONS

4    Firm Registration No. 571

300 Throckmorton St., Ste. 1600

5    Ft. Worth, TX 76102

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 51

```
1   Ranchor@robertsandharrispc.com

2                        October 10, 2023

3   Lynch, James And Shannon, Et Al v. Leeco Steel, LLC

4   DEPOSITION OF: Adam Groves (# 6116227)

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

25

                                        Page 52
```

**[& - address]**

| & | 2002 | 4 | a |
|---|---|---|---|

**&**   1:7 2:11 49:7

**0**

**09/22/2023**
   47:1 49:13

**1**

**1**   1:13 3:13
   12:9,11 25:10
   45:19 49:17
**1-4**   46:4
**10**   30:5 52:2
**1024**   7:21
**10:15**   1:19 46:9
   46:11
**10th**   49:24
**11**   11:2,3,10
**1126**   2:4
**117**   7:21
**12**   30:5
**12-31-25**   51:3
**1213**   7:25
**13**   12:1
**14956**   51:2
**160**   38:12
**1600**   51:4
**1700**   2:8
**18th**   17:24
**19**   1:24

**2**

**2**   3:4,13 12:9,9
   12:11 25:4
   45:22
**2000**   2:12

**2002**   11:21,22
   12:19,20
**2003**   11:23
   12:24
**2015**   11:1,1,1,2
   13:4
**2016**   10:24
**2017**   10:17
**2018**   8:18
**2019**   10:17
**2022**   8:18
   48:14
**2023**   1:12,19
   4:2 49:25 52:2
**22**   1:12,19 25:2
**2223**   31:6
**223**   31:2,20
   36:16,18,22,24
   38:13,18
**22nd**   4:2
**23451**   7:22
**250**   24:23
**27587**   8:1

**3**

**3**   3:14 45:24
**30**   36:3 37:13
   38:11 49:17,19
**300**   23:20 51:4
**30am**   38:10
**30ap**   36:8
**30apm2**   36:2
   37:15
**39**   37:16

**4**   3:14 46:1
**40**   40:13
**400**   2:8,12
   23:23
**41**   3:7
**46**   3:8,13,13,14
   3:14 19:7
**47**   3:9

**5**

**5**   3:6
**50**   3:9 8:25
**5015**   1:6 49:6
**55**   31:16 38:14
**571**   51:4
**5:23**   1:6 49:6

**6**

**6**   13:25 14:15
   15:6 42:11
**6116227**   52:4

**7**

**7**   12:7 13:10
**72201**   2:8,12
**76102**   51:5

**8**

**8/22/84**   10:10

**9**

**90017**   2:4
**9244**   51:2
**99**   17:1,3
**9:06**   4:2
**9:07**   1:19

**a.m.**   1:19,19
   4:2 46:9,11
**abbreviation**
   15:23
**ability**   27:8
**able**   11:2,7
   13:21 24:8
**above**   1:18
   52:5
**absolutely**   5:3
   5:10 7:2,5
   41:19 45:14
**absorb**   38:17
**academic**   17:9
**accounts**   19:10
**accuracy**   52:8
**acknowledged**
   48:12
**acquire**   8:4
**acquired**   33:5
**acronyms**   16:2
**action**   4:17
   42:12 49:22,24
**actually**   14:2
   35:22 36:17
**adam**   1:12,16
   3:5 4:5,7,23
   7:11 9:11 47:1
   48:1,5 49:12
   49:16 52:4
**additional**
   19:19
**address**   7:14,20
   7:23

Page 1

**[addressing - backwards]**

**addressing**
38:8
**advance**  16:12
**aerodynamic**
35:12
**affiliated**  10:1
**affix**  48:2
**afghanistan**
14:8
**africa**  14:8
**age**  13:22
**agree**  5:1 32:6
34:24 35:3
37:4
**agreements**
4:24 5:12
52:14
**ahead**  16:8
23:11 36:14
45:19
**air**  13:14
**aircraft**  13:15
13:15,17
**al**  52:3
**alleged**  21:11
**allegedly**  21:5
21:14
**allotted**  52:15
**alluded**  20:13
20:18 32:1
**ammo**  21:14
31:9
**ammunition**
15:19 17:8,11
21:4,12,15,16

22:9 31:7,13
36:8
**analyst**  10:7
**angeles**  2:4
**answer**  6:11
16:25 27:24
36:14 39:21
**anticipate**  6:2
9:16
**apm2**  38:10
**apologize**  25:2
**appearances**
3:4 4:14
**appeared**  48:10
**applicable**  52:7
52:14
**apply**  11:7
**appointment**
24:22
**appropriate**
27:8,22 28:2,3
28:12,14
**appropriately**
27:4,5
**approximately**
11:8
**ar**  2:8
**area**  8:8 14:11
14:11 26:11
28:10 35:24,25
44:6,23 45:9
**arkansas**  1:2,8
2:12 4:19 30:5
49:2,8

**armor**  16:19,22
17:1,4 18:17
19:23,25 20:14
22:4 25:22,25
26:3,8,9,13,15
27:4,8,9,12,20
27:22 28:1,4
28:20,21 30:4
30:10,18,20
32:5,8,11,14,20
32:24 33:1,3,4
33:5,8,11,14
34:2,5,6,11,25
35:1,8,9,16
37:13 39:14
40:25 42:16,16
42:17,21,21
43:6,8,13,14,17
44:3
**armor's**  28:7
**arms**  28:22
44:23 45:2,9
**article**  41:6
**articles**  40:24
41:2
**asked**  10:8
18:11,14 22:17
39:5 44:20
**assault**  14:1,1
14:17
**asset**  9:1
**assist**  24:14
**associated**
20:18

**association**
16:6 20:25
21:24
**assume**  6:5
12:2 16:18
23:5,17
**assuming**  38:6
38:6
**assumption**
26:20
**asvab**  12:10
**attach**  45:25
**attached**  49:19
52:10,12
**attending**  4:17
**attorney**  49:21
49:23
**attorneys**  49:22
**august**  12:20
17:24 18:6
**authored**  40:24
41:6
**available**  52:6
**avenue**  2:8,12

**b**

**b**  3:11 7:21
37:22
**back**  12:21
13:18,23 14:13
26:7 36:2 37:8
40:16
**background**
10:14
**backwards**
26:20

Veritext Legal Solutions
800-336-4000

[bad - certain]

**bad** 9:12
**ballistic** 15:9
   38:4,6,7
**ballistics** 14:25
   41:4,4
**base** 14:13
   30:15 31:4,17
**based** 30:13,18
   38:19,22
**basically** 15:15
   27:1 32:23
   34:12 35:24
**basis** 38:15,18
**battle** 13:17
**beach** 6:25 7:13
   7:14,20,22
**becoming** 9:22
**behalf** 1:4 4:17
   4:18,20 49:4
**believe** 10:24
   11:1 12:9,22
   14:7 15:2 19:2
   20:14,17 21:18
   29:2,14 31:9
   31:24 33:22
   37:24 38:2
   41:16
**bell** 33:24
**bells** 7:21
**best** 9:20 14:4
   16:25 29:25
   30:8 33:5
   42:23
**bet** 4:12

**better** 6:12
   34:14 35:5
   43:4
**big** 7:6 29:20
**billing** 23:19
**birth** 10:9
**bit** 17:18 25:9
   35:5
**black** 30:3
   42:21 43:7
**body** 16:19,21
   17:1,4 18:17
   19:23,25 20:14
   22:4 25:22,25
   26:3,8,9,11,13
   26:14 27:4,7,9
   27:12,20,22
   28:1,4,7,9,10
   28:20,21 30:4
   30:10,18,20
   32:4,8,11,14,20
   32:24 33:1,3,4
   33:5,8,10,13
   34:2,5,6,11,25
   35:8,9,16,18
   39:14 40:25
   42:16,16,17,20
   42:21 43:6,8
   43:13,14,17
   44:3
**boone** 37:20,22
**boone's** 37:25
**boot** 12:19
**bottom** 25:10
   32:23,24

**boulevard** 2:4
**box** 21:12,15
**boys** 22:13
**breach** 14:3
**breacher** 14:18
**break** 6:1
**brief** 19:23
   45:12
**briefly** 5:21
**brother** 42:11
   42:12
**bud** 12:23
**buford** 37:20
**building** 14:21
   14:22
**bullet** 27:20
   28:9 31:2,16
   31:20 36:9,17
   38:13,14,18
   45:8
**bulletproof**
   26:7
**bullets** 15:4,12
**bunch** 37:9
**business** 8:4
   9:24
**businesses** 10:1
   10:1

**c**

**c** 2:1 15:25 16:1
**caliber** 31:2,7
   34:8 36:3
   37:13 38:11,13
**california** 2:4

**call** 17:4 23:3,5
   23:10 40:11
**called** 9:4 12:16
**camp** 12:19
**capacity** 15:7
   28:8 41:11
**capital** 8:16 9:4
   9:23
**capitol** 2:8,12
**card** 48:11
**cardboard**
   43:23
**career** 33:2
   42:18 43:6
**carolina** 8:1
   40:17
**carrier** 20:12
   43:21
**cartridge** 37:2
**case** 1:5 17:19
   17:21 18:12,15
   18:20 19:21
   22:1,5,18,21,25
   23:9,13 25:9
   26:1 29:9
   33:21 36:13
   37:5,11 38:1
   39:1,7,10,19
   40:10,22 42:5
   42:22 49:5,23
**cause** 1:18
**cavity** 28:10
**ceo** 8:7
**certain** 31:18
   36:17

**[certainly - counterpart]**

**certainly** 16:14
  20:3
**certainty** 29:6
  36:21 39:21
**certificate**
  16:14
**certificates**
  16:9
**certification**
  3:9 13:21
  33:10 49:12
**certifications**
  16:5,7
**certified** 33:18
  49:14 52:16
**certify** 49:15,17
  49:21
**chain** 44:11
**challenge** 9:10
**challenges** 6:18
**change** 43:11
  47:2
**changed** 42:25
**changes** 49:20
  49:20 52:9
**charge** 23:17
**chatting** 45:19
**check** 40:16,19
**checking** 6:24
**chest** 26:21
**chief** 12:7
**chronographs**
  15:10
**civil** 1:23

**clarification**
  8:22 45:25
**clarify** 6:14
  39:4
**clark** 2:11
**class** 12:24,24
**classed** 12:23
**classification**
  34:11
**classifications**
  19:22,25 22:4
  32:4
**close** 27:21
  28:3
**college** 10:19
**colors** 36:22
**come** 31:13
  33:6
**comes** 44:22
**coming** 6:25
**comment** 27:11
  27:11
**commerce** 8:7
  8:8
**commercial**
  8:25
**commission**
  48:19
**commonly**
  13:25
**communicati...**
  13:11
**companies** 8:7
**company** 8:9
  8:11,16 9:4,23

10:3 42:22
**completion**
  49:18
**complies** 32:11
**computer** 24:7
**computerized**
  1:21
**computers** 15:9
**concluded**
  46:11
**conduct** 32:10
  40:5
**conducting**
  22:3
**conglomerate**
  8:8
**connected** 5:14
**connection**
  22:9,18 40:10
**consider** 28:15
  37:5
**consideration**
  48:13
**constitute**
  26:14
**construction**
  36:13
**consulting**
  41:13
**consumer** 27:9
**consumer's**
  27:11
**contacted** 42:4
**contained**
  22:24

**contains** 49:20
**controller**
  13:15
**controlling**
  13:15
**conversation**
  9:15
**conversations**
  23:6
**copy** 24:10
  52:16
**correct** 8:17
  11:17 12:13,17
  13:4,5 15:16
  16:20 17:12,14
  17:16 18:7
  19:8,15 20:19
  22:10,14 24:11
  27:6 29:21,25
  31:14,15,23
  34:23 35:17,20
  38:23 39:10,19
  40:3,6,22
  41:11 43:15
  44:24 45:4
  48:2
**correction** 3:8
  46:25 48:2
**correctly** 18:17
**counsel** 4:14
  5:1 22:17
  49:22
**counterpart**
  38:21

Page 4

**[county - dr]**

| county 19:6,16 48:8 | d | deployment 13:18,20,24 | 15:18,18,19 19:9,22 34:8,9 |
|---|---|---|---|

**county** 19:6,16
48:8
**couple** 6:3 8:22
14:17 21:19
24:15 39:6
**course** 11:10
15:23 16:10
20:16 44:9
**courses** 15:9
16:13
**court** 1:1 6:7
7:18 9:8,21
46:3 49:1
**covid** 1:24
**created** 39:9
**credits** 11:8
**csr** 1:20 51:2,2
**cup** 28:20
**curious** 11:4
**current** 1:24
7:23 8:2 34:5
**cut** 9:6 28:21
28:21,23,24
29:3 30:5,9,9
30:11,11,11,13
30:16,16,20
36:25 43:23
44:21,21,24
45:1
**cv** 1:6 3:13
11:14 45:22
49:6

**d**

**d** 1:7 3:1 49:7
**d&f** 4:19
**daily** 8:10
**dan** 5:11
**data** 18:19,23
29:5,5 39:21
39:22,24
**date** 4:1 10:9
17:23 18:9
47:1 49:19
51:3
**daughter** 24:20
**dawning** 27:20
28:1
**day** 48:10,14
49:24
**daycare** 6:25
**days** 11:24
49:19
**deal** 7:6
**defeat** 14:20
**defeated** 37:11
**defeating** 37:12
**defendant** 1:17
2:6,10
**defendants** 1:9
5:2 49:9
**definitely** 18:23
**definition**
28:25
**degree** 10:19
11:9
**delivered** 45:12

**deployment**
13:18,20,24
**deponent** 49:18
49:18
**deposition** 1:12
1:16 3:13 5:13
5:22 23:23,25
38:25 40:21
45:20 48:1
49:12,16,19,23
52:4
**depositions**
40:21
**describe** 35:4
**describing** 44:2
**description**
3:12 48:11
**design** 36:23
**designation**
37:12
**develop** 34:8
**developed**
18:14 33:4
**developing**
34:1,15
**development**
13:24
**diamond** 30:4
42:21 43:8
**difference**
28:23 34:24
44:21,23
**different** 7:24
9:2 14:19,20
15:8,8,10,11,12

**15:18,18,19**
19:9,22 34:8,9
34:9 35:2,3,8
35:13 36:21
39:24 43:11
**differently**
35:16 44:12
**difficult** 27:10
43:1
**diligent** 20:6
**direction** 34:14
**director** 8:21
9:22
**dirt** 43:22
**disaster** 1:25
**discussed** 22:23
**discussing** 6:18
**discussion**
25:24
**district** 1:1,1
49:1,1
**division** 1:2
49:2
**document**
48:12
**documents**
18:19 22:23
24:8 39:6,13
39:24 40:1
**domain** 41:3
**door** 14:3
**double** 11:10
**dr** 19:1 21:23
24:2 25:14,21
31:5,19 39:17

**[dr - fine]**

40:3
**draw**  16:3
30:19,22
**drexel**  10:20,23
10:24,25 11:6
**driving**  16:17
**due**  18:4
**duly**  1:17 4:6
49:16
**duties**  8:20
13:8

**e**

**e**  2:1,1 3:1,11
7:21 8:7,8 12:7
12:9,9,9,11,11
15:25 16:1
37:22 46:2
48:17
**earlier**  10:8
32:1,17
**early**  7:1 12:24
**easier**  9:21
12:19 25:7
29:20
**educational**
10:14
**eight**  23:16
**either**  11:1 12:9
29:5 33:19
**eldredge**  2:11
**eliminating**
14:22
**emergency**
1:24

**employed**  8:5
49:22
**employee**  49:23
**employer**  8:6
**ended**  12:19
**energy**  36:9,11
38:20
**engagements**
14:10
**engineer**  17:12
17:13
**enlisted**  12:2,8
**ensure**  32:11
**entail**  13:8
**entering**  26:10
28:9
**entire**  14:12
**entry**  14:21
**equipment**  1:8
4:19 49:8
**equity**  11:11
**errata**  52:10,12
52:13
**especially**  16:4
**established**
32:6
**estate**  1:4 8:25
49:4
**et**  52:3
**evaluation**
34:18
**evolving**  25:7
**exact**  12:25
**exactly**  18:20
18:23 42:25

**examination**
3:6 5:18 30:23
41:20
**examined**
20:25 22:8
**except**  48:2
**executed**  48:13
**exhibit**  3:13,13
3:14,14 45:19
45:22,24 46:1
46:4
**exhibits**  46:2
**exited**  8:24,24
**experience**
30:10,18 38:19
38:23 42:16
**expert**  39:18
41:10,13
**expiration**  51:3
**expires**  48:19
**explain**  44:8
**explained**  5:25
**explosives**
14:20 16:17
**expressed**
48:13
**extremely**
14:19

**f**

**f**  1:7 49:7,17
**facilities**  15:8
**facility**  38:4,5
**fact**  17:20
**factor**  37:5

**facts**  18:15
**fail**  34:12
**failed**  25:11
**fails**  52:15
**fair**  43:8,9
**familiar**  14:19
29:1 37:19
**family**  7:16
8:15 9:2,24,25
10:1
**far**  32:9,13,15
43:24
**fashion**  28:2
**fast**  34:18
**faster**  34:7
**fayetteville**  1:2
49:2
**fbi**  38:3,5
**february**  12:25
**federal**  31:8,20
**feel**  9:11
**feeling**  10:11
**fewer**  42:1
**field**  34:20,21
**fight**  17:3
**figure**  25:2
**file**  22:20,24
**filed**  38:13
**final**  14:15
**finance**  10:16
**financially**
49:24
**fine**  5:17 26:5
43:4 46:5

**finishing** 16:15
**firearm** 20:22
  20:24 21:1
**firearms** 15:18
**fired** 43:16,19
**fires** 13:15
**firing** 34:25
  43:14
**firm** 51:4
**firms** 8:23,24
**first** 4:6 13:12
  14:17 18:13
  41:9,11
**five** 14:15,15
  19:9
**focus** 14:9 15:3
**foil** 36:16
**follow** 42:3
  44:7
**following** 49:15
**follows** 4:6
**followup** 42:15
**forces** 13:16
**foregoing** 48:1
  48:12
**forest** 8:1
**form** 5:6,7,8
  26:10 27:23
  28:17 35:14
  40:13
**founder** 8:23
**four** 46:2
**frcp** 49:17
**freefall** 13:19

**freeze** 6:19
**friday** 1:19
  2:11
**fridayfirm.com**
  2:13
**friend** 27:21
  28:3
**front** 24:4
**ft** 51:5
**full** 7:9 17:4,4
  36:18,20,24
**fund** 8:3
**further** 49:17
  49:21,23
**fuzzy** 6:19

**g**

**gaining** 14:21
**general** 11:8
**gentleman**
  37:19
**getting** 14:12
  14:13
**girardi** 2:3
**girls** 7:1
**give** 7:17 24:19
**given** 5:22
  19:16 48:14
  49:17
**go** 5:25 7:1
  10:17,23 16:8
  18:22 20:1
  23:11 24:19
  36:13 45:19
  46:6

**goes** 14:2 24:6
**going** 4:24 5:25
  9:17 13:25
  24:14,18 44:11
**good** 4:16 5:2
  6:24 11:6 24:2
  45:18
**gordon** 2:7
**graduate** 11:20
  16:9
**graduated**
  10:24 12:4,5
**graduation**
  11:24
**graham** 19:5
  19:16
**grain** 31:16,20
  38:14
**grains** 38:12
**grand** 8:16 9:4
  9:23,25 10:2,4
**great** 24:14
**greater** 9:10
  28:22 38:20
**ground** 13:16
  35:10
**group** 9:25,25
  13:24 14:2
  34:19
**grove** 4:5,7 5:4
  5:20 7:11,12
  29:21 41:22
  45:11 47:1
  48:1,5 49:12

**grove's** 45:22
**groves** 1:12,16
  3:5 4:4 49:16
  52:4
**grow** 10:12
**grsm.com** 2:9
**guess** 5:12 15:2
  21:13
**guys** 14:2

**h**

**h** 3:11 7:25
**half** 11:8 36:25
**hand** 4:4 6:10
  21:19 48:14
**hands** 6:9,20
**hanging** 44:11
**happen** 6:22
**happens** 7:5
  9:12
**happy** 6:15
**hard** 6:13 9:7
  34:17
**harris** 2:3 4:16
  4:16,24 5:3,6
  5:10,17 18:3
  18:14 19:17,20
  22:1 23:8
  24:25 27:23
  28:5,17 35:14
  39:3 42:6,7
  45:16,21 46:5
  46:8
**harris's** 23:6
**harrison's**
  18:11

Page 7

**[hatch - kimberly]**

| | | | |
|---|---|---|---|
| **hatch** 14:22 | **identification** 46:4 | **information** 25:13 29:4 | **iraq** 13:18,23 |
| **head** 6:9 42:19 | **identity** 48:11 | 31:23 36:12,23 | **issue** 6:10 |
| **hear** 6:19 41:23 | **impact** 34:10 | 37:2 | 17:20 26:1 |
| 42:14 | 35:2,13 | **inordinate** 35:1 | 42:22 |
| **hearing** 35:15 | **important** 36:1 | **inquiring** 11:14 | **issued** 24:1 |
| **heavy** 42:2 | 36:4,5 38:10 | **inside** 29:24 | **issuing** 22:5 |
| **helicopter** | **improve** 32:14 | **instance** 1:17 | **itemize** 18:21 |
| 14:13 | **inanimate** | **institute** 32:1,3 | **iv** 32:17,20 |
| **help** 40:13 | 27:15 | **instrument** | 33:18 36:7 |
| **helpful** 9:9 | **incident** 5:15 | 48:12 | 37:12 |
| 42:10 | 20:9,11 21:1,5 | **intelligence** | |
| **hi** 41:22 | 22:10,13 40:6 | 12:22 | **j** |
| **high** 7:19 11:18 | 45:6 | **intended** 26:9 | **jacket** 36:16,18 |
| 11:20 27:1 | **included** 20:21 | 26:17 28:7 | 36:20,24 |
| 36:9 | 37:18 | **intentional** | **james** 1:3 49:3 |
| **highest** 10:15 | **including** 23:14 | 27:7 | 52:3 |
| **hired** 41:12 | 23:15,16 37:13 | **interested** | **job** 8:20 48:25 |
| **hold** 16:16 | 37:15 | 49:24 | **jog** 19:23 |
| 24:23 | **incorporated** | **internet** 39:13 | **join** 11:18 |
| **holding** 8:10 | 8:10 | **interpretation** | **joined** 12:19 |
| **holdings** 8:25 | **independent** | 30:12 | **joint** 13:14 |
| **hole** 45:8,8 | 22:5 25:16,19 | **interviewing** | **jotted** 40:12 |
| **home** 1:22 7:23 | 40:5 | 9:1 | **jtac** 13:14,20 |
| **hoping** 7:2 | **indicate** 26:12 | **introduced** | **june** 12:19 |
| **hour** 7:3 23:14 | **indicates** 37:10 | 5:20 | **justice** 32:2,3 |
| 23:21 | 37:14 | **investment** | **k** |
| **hours** 22:25 | **indicating** | 10:7 | |
| 23:13,16 | 18:25 23:2 | **investments** | **k** 7:25 15:25 |
| **houston** 1:22 | **individual** | 9:2 | **kalworth** 7:25 |
| **huh** 6:12,12 | 34:15,25 35:9 | **invoicing** 23:3 | **keese** 2:3 |
| | **individually** | 23:11 | **killed** 42:12 |
| **i** | 1:3 49:3 | **involved** 22:13 | **kim** 41:25 43:3 |
| **idea** 31:10 42:9 | **inferred** 21:13 | 33:7 34:1,15 | 43:4 45:14 |
| **identical** 35:23 | | | **kimberly** 2:11 |
| 44:4 | | | 4:18 43:1 |

Page 8

**[kinetic - make]**

**kinetic**  36:9,11
  38:20
**knight**  8:10
**know**  6:1,4,20
  6:22,23 12:15
  15:22 16:4,16
  16:25 21:8
  26:8 30:11
  31:6,8,9 32:4
  32:19 33:16,19
  33:23 36:18,25
  37:1 42:17
  43:5
**knowledge**
  25:16,19 30:9
  31:12 33:13,17
  35:6 42:20
  43:9
**known**  42:12
  48:10
**kugler**  2:7 3:6
  4:9,20,20,23
  5:4,5,8,11,19
  5:20 18:5
  19:14,18,19
  24:18 25:1,6,8
  28:1,12,19
  41:16 42:1
  45:15,17,22
  46:7
**kyoung**  2:13

**l**

**l**  7:21,21,25
**label**  29:23
  37:7,14

**labelling**  30:17
**laboratory**
  34:22,23 38:7
**lack**  34:14 35:6
**language**  37:15
**laptop**  24:12
**large**  36:9
**larger**  37:18
**launched**  8:3
**laura**  2:7 4:20
  5:4,6,20,23
  6:23 9:5 11:2
  12:14 19:17
  20:5 31:18
  35:5 41:19
**lawsuit**  29:25
  33:14 42:10
**lawsuits**  5:14
**lawyer**  22:20
**lay**  32:23
**laying**  35:9
**layman's**  14:5
**layperson**  36:6
**lead**  13:11,21
**leading**  37:17
**lean**  26:7
**learn**  43:10
**leeco**  1:7 4:21
  25:12,17 49:7
  52:3
**left**  12:5,6 13:4
  14:16
**legacy**  8:23
**legal**  51:3
  52:19

**level**  10:15
  32:17,20 33:18
  36:7 37:12
**levels**  13:17
  32:25 33:3,3
**lifetime**  37:16
**lifting**  42:2
**lighter**  34:7
**lightweight**
  34:7
**liked**  22:16
**line**  47:2
**link**  24:21,23
**liquidation**
  10:2
**listed**  23:1
**literature**
  39:12 41:7
**little**  2:8,12
  12:1 17:18
  25:9 35:5
**live**  27:14,16,18
  43:14
**lkugler**  2:9
**llc**  1:7 49:7
  52:3
**llp**  2:7,11
**load**  11:10 17:4
**located**  1:22
**location**  7:17
  7:24
**loganville**
  10:13
**logs**  23:4,5,10
  40:11

**long**  6:2 7:15
  8:12 10:4
  11:25 15:2,3
  19:7 25:5
  44:14
**look**  39:20
  42:24
**looked**  20:4
  29:13 39:18
**looking**  29:15
  30:10,23,25
  37:7 39:14
**looks**  30:2
  36:25 41:13
**los**  2:4
**lot**  9:21 42:1,2
**loud**  6:11
**lovely**  6:7
**low**  26:25
**lower**  36:11
**lynch**  1:3,3,4
  26:12 27:3
  49:3,3,4 52:3

**m**

**ma'am**  12:3
  16:2 29:17
  38:24 40:4
**machine**  1:8,21
  4:19 49:8
**made**  14:18
  36:19 37:1
**mail**  46:2
**make**  4:24 5:12
  5:15 26:19
  40:8

Page 9

Veritext Legal Solutions
800-336-4000

**[makes - office]**

makes 9:21
man 13:12
managers 9:1
maneuvering
    13:16
manner 26:17
mansukhani
    2:7
manufactured
    25:12,17 42:21
manufacturer
    25:22 31:6
    42:17 43:5
manufacturing
    8:4,23
mark 45:19
marked 46:4
market 33:6
materials 19:20
    22:1
mba 10:15
mean 9:5 16:7
    17:1 26:3,18
    28:20 32:19
    42:23
meaning 26:19
    36:13 41:13
means 15:22
    32:22
meant 44:7
memory 19:24
mentioned 31:8
met 37:23
metal 36:18,19
    36:20,24 38:16

metallurgist
    17:16,17
michelle 1:20
    49:14 51:2
middle 26:21
military 42:18
    43:6
minimum 32:7
minor 1:20
    49:14 51:2
mission 14:12
    17:2
missions 13:21
misuse 26:14
    26:16 28:8
misused 28:11
misusing 26:13
mobility 28:22
    45:2
model 32:17
    33:13
month 7:15
    11:2 12:25
    15:2,3,3
months 8:13
    11:3,10 12:23
morning 4:16
motions 6:9
mounds 43:22
mounted 35:1

**n**

n 2:1 3:1 37:22
name 5:4,20
    7:9 8:9 14:23
    16:17 37:19,21

41:25 42:10
    47:1 48:12
national 32:1,3
navigating
    14:10
navy 11:16,18
    11:22,25 12:5
    12:6,7,12,13,16
    13:3,4,8 14:24
    15:1 16:6,14
    16:18 33:25
    41:3
necessary 11:8
need 5:12 6:1
    6:14 7:1
needless 11:11
needs 7:18
neither 49:21
never 22:8
    27:16,18 33:7
    33:10 42:20
    43:14,16,16
new 15:11 33:5
newer 34:6
nights 11:11
nighttime
    20:15
nij 20:1,3 32:6
    33:11,15
nij's 33:18
nods 6:8
north 8:1 40:17
norton 10:15
    10:17

notarize 52:11
notary 48:17
note 25:10
    28:19 31:16
    36:1,2,4,5
    38:10 52:9
noted 30:17
    48:2
notepad 24:5
notes 23:5 24:5
    40:8,12,12,15
notice 3:13
    38:25 45:20
numbered 1:18
numbers 37:9

**o**

o 7:25 37:22,22
oath 48:11
object 27:15
    35:1,10,14
objecting 5:7
objection 5:1
    27:23 28:5,17
objectives
    14:20
observation
    30:13
obtain 25:13
obtained 25:21
occupation 8:2
    13:7
october 49:25
    52:2
office 8:15
    48:14

**[officer - placing]**

| | | | |
|---|---|---|---|
| **officer** 21:19 49:16 | **opinion** 18:16 25:20 27:3 28:13 30:15,19 30:22 38:15,18 | **part** 9:3,24 14:8 19:3,3 21:1 | 34:15 48:10 |
| **officer's** 19:10 | | **participated** 43:12 | **perspective** 14:13 27:11 28:6 35:12 |
| **okay** 5:24 6:13 6:23 7:4,7,19 9:13,19,22 11:13,15 13:6 13:13 15:5,18 15:21,25 16:11 17:10,18 18:8 18:10 19:13,18 20:8,21 21:4 21:10,21 22:3 22:8,12,20 23:24 24:10,13 24:16,17 25:1 25:20 26:5,24 27:3,7,17 28:15 29:11,18 29:19 30:3,12 30:22 33:20,23 33:25 34:22,24 37:25 38:3 39:12,17 40:5 40:8,18,20 41:12,23 43:2 45:5,17 | **opinions** 18:18 22:6,18 | **parties** 49:22 | **philadelphia** 10:21 |
| | **opposed** 34:25 35:9 | **partners** 10:2,4 | **phone** 6:24 |
| | **opposition** 5:13 | **party** 49:18 | **photographs** 45:5 |
| | **oral** 1:12,16 49:16 | **past** 41:12 43:8 | **photos** 3:14 |
| | **order** 1:24 37:17 | **penetration** 38:17,21 | **physical** 17:7 17:11 26:18 27:5 30:13,23 |
| | **original** 34:10 | **pennsylvania** 10:13,16 | |
| | **originally** 13:10 | **percent** 8:25 17:1,3 | **physically** 21:1 28:2 34:13 35:11 |
| | **outcome** 49:24 | **perforated** 45:6,8 | |
| | **oversaw** 8:22 8:22 | **perform** 27:8 35:16,22,23,25 | **physicist** 17:14 17:15 |
| | **overseas** 42:12 | **performance** 7:19 32:7 | **picture** 20:22 20:24 21:12,15 21:16 29:8,12 29:23 32:16 46:1 |
| | **p** | | |
| | **p** 2:1,1 | **performed** 33:10 | |
| | **page** 3:2,8,9,12 25:10 39:8 40:13 46:25 47:2,25 48:2 49:20 | **performing** 34:13 | **pictures** 19:2,3 20:8,9,10,11,12 20:13,15,17,21 21:4,7,11,20,24 30:14,23,25 40:2 |
| **old** 10:11 | | **periodically** 6:24 | |
| **oldest** 25:4 | | **person** 27:5,15 27:16,18 43:15 44:5 48:12 | |
| **online** 19:23 20:1 22:3 | **pages** 19:7 52:12 | | **piece** 35:25 44:6 |
| | **panel** 32:24 | **personal** 38:22 | |
| **operations** 8:21 9:23 | **parenthesis** 38:11 | **personality** 9:14 | **piercing** 37:13 |
| | **parker** 1:4 31:1 38:13 49:4 | **personally** 22:8 24:22 27:12 | **place** 21:9 |
| **opine** 38:16 | | | **placing** 9:2 |

**[plaintiff - readily]**

plaintiff  2:2
plaintiff's
  22:17
plaintiffs  1:5
  4:17 49:5
planning  14:12
  14:12
plate  25:10,17
  29:2 30:8,11
  30:16,16,21
  36:2,7 37:8,10
  38:17 44:10,11
  44:12 45:6,9
  46:1
plates  27:1
  30:24 43:1
platforms
  15:12,13
platoon  13:11
please  4:4,14
  6:4,14 7:9
  27:25 44:8
point  11:9 13:6
  31:8 34:12
police  18:24
  19:1,4,5 20:18
  20:25 21:23,24
  29:5 31:5,13
  31:19,24 36:15
  40:2,13
positioned
  43:19
prefer  43:3
prepare  23:24
  39:14

present  5:2,11
president  11:5
pretty  6:24
  29:20
print  29:20
prior  8:5,14 9:3
  9:22
private  10:2
  11:11
probably  14:14
  15:7 29:20
problem  24:25
procedure  1:23
proceedings
  46:11
produced  1:16
program  11:6
  13:3
projectile
  25:11 36:12,17
  37:4,11 38:12
  38:20
projectiles
  26:10
proof  27:20
properties  17:7
  17:11 36:19
propped  35:18
  35:21,22 44:12
  44:14
props  20:13
protocol  34:1
  34:16
protocols  34:18

prototype  34:6
proved  48:10
provide  18:16
  32:4 39:4 45:2
provided  18:3
proximity  34:9
psychiatrists
  24:21
public  41:3
  48:17
published  41:2
  41:7
pull  7:20 24:13
purchased
  36:16
purpose  26:9
purposes  7:18
  19:14 23:3
  25:24 27:19
  45:17 48:13
pursuant  1:22
  1:23 49:17
pushed  35:10
put  14:5 26:19
  26:20 43:4
putting  15:4

**q**

qualifications
  16:16
quantico  38:4
quantities  34:9
question  6:4,6
  9:17,18 22:7
  27:25 30:8

questioning
  19:15
questions  6:3
  24:15 41:17
  42:1,3,15
  44:20 45:13,16
quite  26:6

**r**

r  2:1 7:25 15:25
  16:1
radio  13:11
raise  4:4
raleigh  8:8
ranchor  2:3,5
  4:16 5:24 18:1
  19:14 42:13
  45:15 52:1
range  27:21
  38:8
rank  12:6,8
rasby's  19:2
  21:23 24:2
  25:14,21 31:5
  31:19 39:17
  40:3
rate  12:21
  23:19
rather  26:8
  30:16
reaching  7:1
react  44:11
read  6:13 48:1
  52:6,8
readily  38:17

Veritext Legal Solutions
800-336-4000

**[reading - round]**

**reading** 37:17
**real** 8:25 17:5
**really** 6:1,12
 7:2 11:6 39:3
**reason** 41:7
 47:2
**reasons** 49:20
**recall** 12:24,25
 13:12 20:4,9
 39:20 43:24
**receipt** 49:19
**receive** 21:25
 40:20
**reci** 14:9,9 15:6
 15:7,23
**recognizance**
 15:24,25 34:19
**recognize**
 15:21
**recollection**
 42:23
**recommend**
 28:18
**recommended**
 28:16
**reconvene** 7:6
**record** 4:3,14
 7:10,18 24:20
 45:18 46:6,10
 49:17,23
**recorded** 22:13
**recreate** 40:6
**rees** 2:7
**refer** 24:8
 34:16

**referenced** 52:5
**referred** 13:25
 20:8 40:2 46:1
**referring** 15:14
 39:8,22
**refers** 36:3
 37:15 38:11
**reflected** 40:9
**regarding** 1:24
**registration**
 51:4
**related** 41:4
 49:22
**relative** 49:23
**relied** 44:19
**rely** 39:12
**relying** 31:22
 31:24
**remained** 13:3
**remotely** 1:21
**repeat** 27:25
**rephrase** 6:5
**report** 3:14
 17:18,20 18:5
 18:14,16 19:2
 19:5,6,9,16
 20:18,25 21:23
 21:23,25 24:1
 24:2,11,15
 25:9,15,21
 26:12 28:19
 29:6 31:1,5,5
 31:14,19,19,24
 36:1,15 37:25
 38:9 39:7,7,8,9

39:11,15,17
 40:2,3,9,13,14
 41:6 45:24
**reported** 1:21
**reportedly**
 25:11 38:14
**reporter** 4:1,8
 4:11,13,22 6:7
 7:18 9:8,21
 46:3,9 49:15
**reporter's** 3:9
 49:12
**reports** 18:24
 19:1,4 39:18
 40:24 41:2
**requested**
 49:18
**required** 6:11
**research** 22:4
 32:14 38:4
**responsiveness**
 5:9
**resting** 20:14
**result** 15:19
 35:8 44:15,16
**results** 44:4
**resume** 39:6
**return** 52:12
**returned** 49:19
 49:19
**reversing** 27:1
**review** 18:15
 18:20 19:20
 21:20,25 22:1
 22:21 28:25

29:4,8 31:25
 33:20 40:10
**reviewed** 18:24
 19:1 24:1,2
**reviewing**
 18:18 19:22
**rezz** 31:2
**ridiculous**
 26:20
**rifle** 31:3
**rifles** 15:10
**right** 4:1,4,11
 4:13,22 5:7
 6:17 7:9,20
 11:16 14:6
 17:25 18:2,6
 25:8 29:6 30:6
 32:17 35:12
 38:10 41:10
 45:3,9,11
**ringing** 33:24
**road** 7:21,25
**robertsandha...**
 2:5 52:1
**rock** 2:8,12
**room** 18:19,19
 18:23 29:5
 39:21,22
**rossi** 31:2
**rotations** 14:7
 14:14
**round** 36:3,9
 36:10,11 38:12
 38:18

Veritext Legal Solutions
800-336-4000

**[rounds - specialist]**

| | | | |
|---|---|---|---|
| **rounds** 21:20 34:9 36:22 | 14:24 15:1,6 16:9,14,18 | **sheet** 52:10 | **six** 14:14 15:3 19:9 |
| **rule** 49:17 | 33:25 42:11 | **sheriff's** 19:6 19:16 | **size** 14:19 30:5 |
| **rules** 1:23 52:14 | 48:14 | **ship** 14:22 | **sleep** 24:2 |

**s**

**s** 2:1 3:11 4:7 7:21 12:23 48:17
**sales** 1:8 4:19 49:8
**sandbag** 44:13
**sandbags** 43:22
**sat** 11:5
**saw** 21:16
**saying** 24:20 37:17
**says** 30:3,4,5 32:17 37:8
**scenario** 43:17
**scenarios** 43:20 43:25
**school** 10:15 11:18,20 12:21 13:19,19 15:1 15:1
**schools** 15:14
**scientific** 35:6
**scopes** 15:11,11
**score** 12:10
**screened** 13:24
**scully** 2:7
**seal** 12:13,16 12:24 13:2,3,8 13:10,25 14:15

**searches** 19:24
**searching** 8:3 39:13
**second** 13:23 24:19,23
**see** 6:9 18:9 21:4 29:16 34:10 38:25 39:5,21
**seek** 19:19 20:2
**seen** 21:2 22:17 29:21 37:25 45:5
**select** 15:11
**sells** 31:20
**send** 24:24
**sent** 4:10 19:20
**september** 1:12 1:19 4:2
**serve** 11:25
**served** 11:15
**service** 11:22 14:24 16:6 41:18
**setting** 33:8
**shannon** 1:3 49:3 52:3
**shape** 30:20,21
**shaped** 38:20
**sharp** 15:15

**shoot** 27:21 28:3 34:8
**shooter** 15:15 16:12
**shooters** 28:24 30:5,9,16 44:21
**shooting** 15:8,9 15:10 27:7,12
**short** 11:12
**shorthand** 49:14
**shot** 31:1
**shoulder** 45:9
**shoulders** 28:22 44:23 45:2
**show** 18:23 29:18
**showed** 32:16
**sign** 52:6,11
**signature** 3:9 47:25 48:2 49:18,20 51:2
**signed** 39:9 52:17
**similarly** 38:20 43:24
**single** 8:15 31:2
**site** 20:9,11

**small** 14:2
**smaller** 36:11 37:18 38:21
**sniper** 13:19,20 14:10 15:1,1 15:10 16:10 38:8
**solely** 14:9
**solid** 44:13,15
**solutions** 51:3 52:19
**somebody** 21:19 31:22 41:13 43:16
**sophisticated** 26:6
**sorry** 4:9 9:5 11:2 12:4 14:16 25:1,1 35:6 42:14 43:3
**sound** 17:25 18:1,6 19:8,15
**sounds** 18:7 19:12
**sources** 20:2
**space** 13:17
**speak** 22:20
**special** 37:8
**specialist** 12:22

Veritext Legal Solutions
800-336-4000

**[specific - thank]**

specific   12:21
   14:25 15:12,13
   20:1
spell   15:22
spend   24:22
spent   9:1 23:13
spoken   39:16
sponsor   32:14
squadron
   14:18
st   51:4
standards   32:7
   32:10,11 33:8
   39:14
standing   43:21
start   4:25 8:8
   10:25 13:1
started   5:21
   11:22 33:2
state   1:20,24
   4:14 7:9 31:1
   48:8,17 49:15
stated   27:2
   36:2,15,15
statement   31:4
states   1:1 49:1
stating   36:6,7
ste   51:4
steel   1:7 4:21
   25:22 49:7
   52:3
stenotype   1:21
sticker   29:23
stickler   18:8

stop   6:20 25:11
   26:10 28:9
   32:22
storm   6:25
strategic   8:21
   9:23
strike   13:6
   30:14
stuart   7:11
studies   11:9
styled   1:18
subject   29:24
   33:14
subscribed
   48:12 49:24
suite   2:8,12
   7:21
summaries
   40:9
summarize
   43:20
summer   12:20
supplied   39:25
suppose   13:1
supposedly
   21:16
sure   5:24 13:10
   38:9 40:12
   45:21 46:7
surface   35:24
   44:6
suspended
   43:22,23
swimmers
   28:20,21,23

29:2 30:9,11
   30:13,16 44:21
   45:1
sworn   1:17 4:6
   49:16,24

**t**

t   3:11 7:25
   48:17
take   6:1,8 22:8
   40:8
taken   1:18
   40:21 49:13,23
takes   6:7 7:3
talk   9:9 15:21
   17:18 25:8
talked   23:8
   31:10 39:14
   40:11
talker   6:10
talking   25:25
   26:22 39:23
   41:3
target   14:3,11
   14:11 43:23,23
targets   15:4
team   13:10,25
   14:1,2,9,9,15
   15:6 38:8
   42:11
teams   14:10
tech   31:2
technological
   6:18
tell   7:6 9:15
   29:6,15 30:3

41:25 43:18
ten   8:13 11:24
term   25:25
   34:14,20
terminal   13:14
terminology
   12:17 16:4
terms   14:5
   22:21
test   27:8 34:16
   44:4
tested   27:12
   33:15 37:8
   43:14 44:17,18
testified   4:6
   43:12
testify   41:14
testifying   43:7
testimony
   33:20 43:13
   49:17 52:8
testing   20:14
   32:10 34:1,18
   40:5 42:16
   43:12,19 44:3
tests   34:13
texas   1:20,22
   1:23 48:8
   49:15
texting   24:20
thame's   33:21
thank   4:11 5:10
   7:8 19:18
   41:17,18 44:1
   45:13

Page 15

**[thanks - veritext]**

**thanks**  4:8 41:19 43:4
**therefor**  49:20
**thing**  15:15 17:6 40:7
**things**  14:4 39:4,5
**think**  12:9,25 17:23 18:3,22 19:6 22:19 25:2 28:6 35:15 45:1,12
**thought**  11:13 36:5
**threat**  37:8
**three**  10:5 12:23 15:2,3,7 15:7 23:10 31:21
**throckmorton**  51:4
**time**  4:2,13 6:1 6:3,19 9:1 12:12 14:17 16:18 18:13 23:17 25:5 34:6 41:9,11 41:17 42:25 46:9 52:15
**timeframe**  12:20 52:7
**times**  16:19 23:8,10 27:13
**tlb**  1:6 49:6

**today**  7:12,13 24:4,22 42:2 43:9
**today's**  4:1 23:24
**told**  9:7
**tontitown**  30:4
**took**  11:10 12:22 40:12
**top**  42:19
**touching**  35:24 44:6
**tough**  16:2
**train**  17:2
**trained**  17:7
**training**  12:16 13:2 14:1,25 15:15 16:21 17:3,5,9 27:18 32:25 38:3,5,6 38:7 41:4 43:17
**transcript**  49:16,19 52:5 52:16
**transcripts**  40:21
**trial**  43:7
**trips**  15:7,21
**true**  42:22,24 45:6 48:2 49:17
**truthfully**  7:3
**try**  9:17,18 14:4 40:6

**trying**  18:8 26:19 28:6
**two**  8:24 13:12 14:7 23:10 39:8
**tx**  51:5 52:13
**tx6116227**  48:25
**type**  14:25 15:15 16:19 19:24
**types**  14:19 15:12
**typo**  4:9 11:14

**u**

**u.s.**  11:16,25
**uh**  6:12,12
**under**  48:14
**undergo**  14:25
**undergrad**  11:3
**undergrads**  11:7
**undergraduate**  11:9
**understand**  6:4 7:24 12:12 22:7 26:16 32:9,13,15 36:8
**understanding**  11:15 13:16 20:20 24:10 26:2 30:1 35:7 44:10,15,22

**understood**  6:6 6:14 43:13
**united**  1:1 49:1
**university**  10:16,20
**untrained**  27:21 28:2
**updates**  32:7
**uphold**  32:12
**use**  5:12 15:18 16:21 25:24 27:8,22 28:3,3 28:7,12,14,16 34:21
**used**  5:14 21:5 21:5,16 22:9 25:22 28:9 34:20 36:10,17 52:16
**using**  15:9,9 34:5

**v**

**v**  52:3
**vacation**  7:15
**various**  16:12 16:12 32:25 33:3,3
**vault**  18:19 39:24
**vehicle**  14:22 20:15
**velocity**  37:4
**verify**  52:8
**veritext**  51:3 52:12,19

Page 16

**[veritext.com. - zoom]**

| | | | z |
|---|---|---|---|
| **veritext.com.** 52:13 | **watch** 22:12 | **wore** 16:19 17:1 33:3 43:6 | **zoom** 1:22 6:17 9:11 24:21 |
| **vest** 25:22,25 26:3,7 27:20 29:8,12,24 30:21 32:16 33:17 43:18,21 44:3 | **watson** 21:17 | **work** 8:12 9:3 9:24 10:4 12:7 22:5 34:20,21 42:4 | |
| | **way** 17:3 28:21 29:18 30:11 34:4 43:4,11 | | |
| | **we've** 20:18 39:8,16 40:1 | **worked** 8:15 10:1 42:7,11 | |
| **vests** 42:17 | **weapons** 15:4 15:11,13 | **working** 11:11 | |
| **video** 19:3 20:16 21:24 40:2 | **wear** 26:21 | **workout** 24:3 | |
| | **wearing** 26:16 26:19,25,25 27:4 43:15,16 44:17 | **works** 1:8 4:19 49:8 | |
| **videotape** 22:12 | | **worn** 18:17 26:17 35:18 42:18,20 43:7 44:4 | |
| **virginia** 6:25 7:13,13,14,19 7:20,22,22 | **website** 20:1 | | |
| | **weight** 38:12 | **worry** 5:16 | |
| **vital** 26:11 28:10 | **went** 12:20 13:19 14:8 33:2,5 45:23 | **worth** 51:5 | |
| | | **wrote** 18:5 | |
| **volume** 1:13 | | | |
| **voluntary** 32:7 | **west** 2:12 | x | |
| **vs** 1:6 49:6 | **western** 1:1 49:1 | **x** 3:1,11 30:5 48:17 | |
| w | **willing** 18:15 | | |
| **w** 2:8 7:25 15:25 | **wilshire** 2:4 | y | |
| **wait** 9:17 25:6 | **withstand** 34:10 36:8 | **yeah** 5:17 11:1 11:5 18:5 44:9 46:7 | |
| **waive** 6:20 | **witness** 1:17 4:7,12 18:1 25:4 41:19 45:14 47:1 49:16,17 52:5 52:7,9,11,15 | | |
| **wake** 8:1 | | **year** 15:8 18:6 | |
| **walk** 12:18 13:9 | | **years** 10:5 12:1 13:12 14:15,15 14:18 37:16 | |
| **want** 7:16 24:13,22 25:8 36:20,21 39:4 | **wizard** 31:3 | | |
| | **word** 35:12 | **young** 2:11 3:7 4:18,18 13:22 41:21,25 45:11 | |
| **wanted** 45:19 | | | |

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.